# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

   v.                                                             **Case No. 98-CR-104**

**ANTONIO MENDEZ**
        **Defendant.**

## MEMORANDUM

A jury convicted defendant Antonio Mendez of racketeering, 18 U.S.C. § 1962(c), racketeering conspiracy, 18 U.S.C. § 1962(d), and committing a murder in aid of racketeering activity, 18 U.S.C. § 1959. The charges all arose out of defendant's involvement with the Latin Kings street gang. I sentenced defendant to life imprisonment under the then-mandatory sentencing guidelines. Defendant appealed, and the court of appeal affirmed his convictions. United States v. Olson, 450 F.3d 655 (7th Cir. 2006). However, because his direct appeal was pending when the Supreme Court decided United States v. Booker, 543 U.S. 220 (2005), the appellate court ordered a limited remand of defendant's sentence pursuant to the procedure outlined in United States v. Paladino, 401 F.3d 471 (7th Cir. 2005). Under that procedure, the district court must decide whether it would adhere to the original sentence knowing that the guidelines are now advisory. It must then either place on the record a decision not to re-sentence, with an appropriate explanation, or inform the court of appeals of its desire to re-sentence. Id. at 484.

After reviewing the arguments of counsel and the entire record, I conclude that in the present case I would impose the same sentence even knowing that the guidelines are

advisory only. In this memorandum, I set forth the basis for this conclusion.

## I. FACTS AND BACKGROUND

The government charged defendant and about thirty other members of the Latin Kings street gang with racketeering and drug-related offenses. Following a nine-week trial, a jury convicted defendant of all three counts in which he had been charged: racketeering (count one), racketeering conspiracy (count two), and commission of the murder of Jenna Gonzalez, a fifteen year old girl, to maintain or increase his position with the Latin Kings, an enterprise engaged in racketeering activity (count four). The jury further found that defendant committed the following predicate racketeering acts: the murder of Jenna Gonzalez; solicitation of arson and attempted arson of the home of Koni Watson, a witness on the Gonzales murder; and attempt to tamper with Joel Castillo, another witness on the Gonzales murder.

The probation office prepared a pre-sentence report (PSR), which set defendant's offense level at 45 and his criminal history category at V, producing an imprisonment range of life. At sentencing, which happened to fall on Jenna Gonzalez's birthday, her mother and father discussed the impact of the crime on them and requested that I impose the maximum sentence. Koni Watson and her mother, Marsha Jenks, discussed the threats and attacks in which defendant and his cohorts engaged against them, which required Watson to be relocated by the witness protection program, and also asked that I protect them for as long as possible.

After considering the victims' statements and the arguments of counsel, I declined to depart downward and sentenced defendant to life on all counts of conviction. Defendant appealed, and, as noted, the court of appeals affirmed his convictions but ordered a

2

Paladino remand of the sentence. Olson, 450 F.3d at 682-83. I ordered briefs, which the parties have now submitted.[1]

## II. DISCUSSION

### A. Sentencing Procedure

In light of Booker, I follow a three-step sentencing procedure. First, I determine the advisory sentencing guideline range. Second, I decide whether to grant any departures pursuant to the Sentencing Commission's policy statements. Finally, I select a sentence that is sufficient but not greater than necessary given all of the factors set forth in 18 U.S.C. § 3553(a). E.g., United States v. Cull, 446 F. Supp. 2d 961, 962 (E.D. Wis. 2006).

Section 3553(a) directs the court to consider seven factors in imposing sentence:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the now-advisory guideline range;

---

[1] On the limited remand, defendant was originally represented by Attorney Kent Carlson, who filed a brief on his behalf. However, defendant subsequently replaced Carlson with Attorney Ness Flores. I approved the substitution and granted Flores an extension to file a new memorandum. I further advised that I would disregard the previous memorandum filed by Carlson. (R. 2393).

3

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentence disparities; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). The statute then directs the court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." Id.

**B.  Analysis**

### 1.  Nature of Offenses

The evidence at trial demonstrated that the Latin Kings were an extremely violent and destructive force on the south side of Milwaukee, engaging in drug dealing and acts of violence to enhance and protect its position in that area of the City. Defendant was an active and important member of the gang and participated in the conduct of its affairs and enforcement of its rules, including administering "violations" (i.e., beatings) to members who broke the gang's rules.

The jury specifically found defendant guilty of certain acts related to the Kings' racketeering activities. The first and most serious was the May 7, 1993 murder of Jenna Gonzalez. The evidence at trial showed that defendant believed Gonzalez had helped the Spanish Cobras, a rival gang, kill a Latin King known as "Redman." Defendant abducted Gonzalez, choked and beat her, and threw her in the Root River to die. Two days later defendant confessed the murder to his girlfriend, Koni Watson. The next day, during a violent argument, defendant attacked Watson and said, "Do I have to kill you too?" Jenna Gonzalez's badly decomposed body was found in the Root River on May 16, 1993. An

4

autopsy revealed lacerations to her head, a fractured jaw, cracked skull and other signs of blunt force trauma, injuries consistent with the beating defendant described to Koni Watson.

In his Paladino memorandum, defendant notes that there was conflicting evidence on the murder of Jenna Gonzalez, and that the key witness against him, Watson, changed her story. (Def.'s Mem. [R. 2411] at 2.) However, the conviction did not hinge entirely on Watson's testimony. The government presented evidence that Redman, a/k/a Craig Abbendroth, was a Latin King and friend of defendant, and was shot in the head in Chicago in November 1992.[2] Defendant confessed to David Lozano, the Latin King leader (or "Inca") at the prison in which he was confined for an unrelated rape, that he beat Gonzalez and threw her in the river because she set up Abbendroth to be killed by the Spanish Cobras. He made similar admissions to Robin Betz and Joel Castillo. In any event, the jury specifically found defendant guilty of murdering Gonzalez in order to maintain his position within the Latin Kings, and the court of appeals found the evidence sufficient to sustain the verdict.

Defendant sought to intimidate Watson so that she would not testify against him. When he was first charged with Gonzalez's murder in state court, he tried to get Watson to lie for him at a preliminary hearing.[3] He also solicited other Kings to attempt to intimidate

---

[2]It is unclear exactly what happened to Abbendroth. The Illinois state patrol concluded that the gun shot wound was self-inflicted, but Abbendroth's father and defendant believed that he was the victim of a gang-related shooting.

[3]Defendant testified on his own behalf at the state murder trial, which ended in an acquittal. Defendant has since admitted that his testimony during that trial was false. During his testimony in the present case, defendant admitted being at the scene of Gonzelez's murder but denied involvement in her killing. He further admitted that he had

5

her. In July 1993, defendant directed other Kings to throw bricks and firebombs and shoot at Watson and her parents' home. On November 6, 1993, defendant called Watson's father and stated, "This is a Nasty Boy. I'll be out in nine months you fucker."[4] On December 29, 1993, the windows of the Watson home were smashed with rocks and bricks. On January 6, 1994, Kings threw a Molotov cocktail into the Watson home. Watson's parents were asleep inside the home at the time, but fortunately the gasoline in the cocktail did not ignite when it hit the carpeted floor of the living room.

Finally, in 1997, after defendant became aware that the federal government was investigating the Kings, he sent a letter to Joel Castillo, to whom he had previously confessed involvement in Gonzalez's murder, trying to persuade Castillo to lie for him or refuse to cooperate in the investigation. Castillo interpreted the letter as a warning not to "snitch." Defendant sent similar letters to others he believed were cooperating.

Defendant offers nothing in mitigation of his conduct in threatening Watson and tampering with Castillo. Further, I (again) reject his trial testimony that he was simply present when Gonzalez was killed.[5] In sum, defendant's crimes were among the most serious and depraved I have seen, and defendant offers nothing persuasive in mitigation.

---

previously tried to falsely implicate Watson in the murder.

[4]The evidence showed that defendant was part of the Nasty Boys gang, which was later subsumed into the Latin Kings.

[5]Paragraphs 69-72 of the PSR set forth in detail why defendant's trial testimony made no sense. I adopted the PSR as my findings of fact at the original sentencing and adhere to those findings now.

6

### 2. Character of Defendant

At the time of his original sentencing in 2001, defendant was twenty-six years old and had already compiled an extremely serious record. In June 1993, defendant was convicted of two counts of endangering safety by use of a dangerous weapon arising out of an incident in which he fired four or five shots at two individuals in an alley. In November 1993, he was convicted of battery arising out of an incident in which he choked a female victim for several minutes, cutting off her breathing. In March 1994, he was convicted of second degree sexual assault of a child and child abduction arising out of an incident in which he grabbed, stripped, beat and attempted to forcibly rape a sixteen year old girl, leading to a thirty year state prison sentence.

Defendant also had a lengthy and continuing history with the Kings. Following his imprisonment on the rape charge, he held the rank of "Acting Chief Enforcer" in a prison chapter of the Kings and attempted to recruit new Kings while he was incarcerated. He also violated prison rules on numerous occasions and possessed gang-related items.

As the government notes in its Paladino submission, defendant also has a history of dishonesty. He perjured himself at trial in this case,[6] as well as in the state trial.[7] He also lied to law enforcement and attempted to falsely implicate Watson in Gonzalez's murder.

Defendant did little positive with his life prior to his incarceration on the rape case.

---

[6] Paragraphs 59-79 of the PSR set forth defendant's perjured testimony in the trial in the instant case.

[7] In the trial in this case, defendant admitted that "everything [he] said in state court was a lie." (PSR ¶ 74.)

7

He dropped out of school in the tenth grade and had a limited employment history. In his Paladino submission, defendant presents absolutely no positive character evidence or any reason to believe that if released he will change his ways. In sum, there is little or nothing positive in defendant's background.[8]

### 3. Purposes of Sentencing

As noted, the guidelines in this case call for a life sentence. I conclude that such a sentence is necessary to satisfy the purposes of sentencing.

First, a life sentence is necessary to promote just punishment. 18 U.S.C. § 3553(a)(2)(A). Defendant participated in the brutal murder of a teen-aged girl, then attempted to intimidate and pressure the witnesses to his crime. He has at no point expressed any remorse for his conduct and continues to maintain his innocence. He has displayed total disregard for human life, and anything less than a life sentence would in the face of such conduct fail to promote respect for the law.

Second, a life sentence is necessary to protect the public. 18 U.S.C. §

---

[8] The court received letters from defendant's family and family supporters, but none provide any real insight on the issue before me. For instance, defendant's family priest writes that the family has been damaged by defendant's incarceration. However, the priest does not indicate anything about defendant or even that he knows defendant. Instead, he writes that the family believes that defendant is in prison unfairly. Another family friend, Rebecca Ramirez, writes that defendant's parents are great people, but she says nothing about defendant. Pedro Colon writes that he has known defendant's father for about six years, and he is an outstanding member of the community. But he says nothing about defendant. Defendant's father writes asking that I give defendant another chance and states that defendant will not be in trouble again. However, he provides no reason for me to believe that given defendant's record, in and out of prison. Defendant's brother states that defendant was young and made mistakes. His mother also states that defendant made mistakes and learned from them the hard way. But neither letter provides any basis for believing that defendant has reformed. I do not doubt that defendant's family misses him and would try to help him if he were released. But nothing in their letters persuades me that a different sentence would be appropriate.

8

3553(a)(2)(C). Given the brutal nature of this crime, defendant's record of violence and his continued involvement with the Latin Kings, the public must be protected for as long as possible. Defendant presents no evidence of reform or rehabilitation, such that I could conclude that the public would adequately be protected by a lesser term.[9]

Third, a life sentence is necessary to satisfy the needs for both general and specific deterrence. 18 U.S.C. § 3553(a)(2)(B). Defendant's conduct, including his continued involvement with the Kings even while imprisoned on the thirty year state rape sentence, reveals total disrespect for the law and demonstrates that he will not be deterred by lesser sanctions. Further, others who may consider revenge murders of the sort defendant committed must be told in no uncertain terms that the most severe penalty awaits them if they follow through.

Fourth, defendant presents no evidence that his rehabilitative needs support a lesser sentence or that he has any such needs.[10] 18 U.S.C. § 3553(a)(2)(D).

Finally, given the guideline recommendation and the sentences imposed upon the similarly situated co-defendants in this case – Andrew Acosta, Pedro Martinez and

---

[9]Generally speaking, recidivism declines with age. However, as I noted in the Paladino remands of other defendants in this case, such generalities must be considered in light of the specifics of the case. (R. 2402 at 9; 2410 at 9.) The evidence in this case reveals defendant to be dangerous and a continuing threat to society. See, e.g., United States v. Bullion, 466 F.3d 574, 577 (7th Cir. 2006) ("But given the defendant's unusually violent criminal history and the fact that even an elderly person has enough strength to pull the trigger of a shotgun, the district judge could certainly worry about what the defendant might do in his seventies.").

[10]It appears that defendant has taken steps towards getting his GED in prison, which is to his credit.

9

Wilfredo Vasquez – all of whom received life sentences,[11] a life sentence for defendant best promotes the need to avoid unwarranted disparity. 18 U.S.C. § 3553(a)(6).[12]

In sum, the factors in § 3553(a) require imposition of a life sentence.

### 4. Defendant's Arguments

In his Paladino submission, aside from attempting to downplay his role in Gonzalez's murder, defendant presents nothing in mitigation of his crimes. Nor does he present any positive character evidence supporting a lesser sentence. Rather, the bulk of his arguments concern the alleged impropriety of a life sentence in light of the constitutional holding in Booker. None of his arguments have any merit.

Defendant first claims that, post-Booker, "the sentence must not be based on facts which were not found by a jury or admitted by the defendant." (Def.'s Mem. at 4.) However, "Booker does not stand for a defendant's right to have every element of every sentence enhancement proved to a jury beyond a reasonable doubt; rather, it transformed the Federal Sentencing Guidelines from a mandatory framework to an advisory one." United States v. McCaffrey, 437 F.3d 684, 690 (7th Cir. 2006). In other words, although Booker held "that judges may not find facts that increase the maximum punishment and that a mandatory sentencing guidelines scheme violates that rule, [the Court] resolved the problem by making the guidelines advisory; judicial fact-finding in sentencing is acceptable

---

[11] I re-imposed a life sentence on Acosta after his sentence was vacated and remanded. I advised the Seventh Circuit that I would impose the same, life sentences on Martinez and Vasquez on their Paladino remands.

[12] Defendant also owes nearly $8000 in restitution to the victims and their families. Given his sporadic employment in the community, I find that the need to make restitution is properly served by requiring payment through the Inmate Financial Responsibility Program, as I previously ordered. See 18 U.S.C. § 3553(a)(7).

10

because the guidelines are now nonbinding." United States v. Robinson, 435 F.3d 699, 701-02 (7th Cir. 2006). Further, as defendant concedes, the jury's verdict in the present case authorized a sentence of life imprisonment, so there is no Sixth Amendment violation in imposing such a sentence. See United States v. Peters, 462 F.3d 716, 719 (7th Cir. 2006) (noting that so long as the judge imposes a sentence within the statutory maximum authorized by the jury's verdict or the defendant's admissions, findings need not be made beyond a reasonable doubt).

Continuing in this vein, defendant argues that the jury's verdict in his case did not mandate a sentence of life imprisonment. He notes that the life sentence in this case was imposed under U.S.S.G. § 2A1.1, the first degree murder guideline.[13] However, although the jury found him guilty of committing the murder of Jenna Gonzalez in order to maintain his position within the Latin Kings, the jury did not specifically find that he acted with malice or premeditation, which, he states, is essential for a first-degree murder conviction. He then argues that "applying Booker's Sixth Amendment rationale, the jury's verdict does not support a sentence under the first-degree murder Guideline." (Def.'s Mem. at 5.) He claims that "the facts as found by the jury support a sentence no greater than the guidelines applicable to second-degree murder, voluntary manslaughter, or involuntary manslaughter." (Id.)

Again, defendant misunderstands the effect of the remedial opinion in Booker. Under Booker, jury findings are not necessary in setting either the guideline range or the

---

[13]The applicable racketeering guideline directs the court to use the offense level corresponding to the most analogous federal offense where, as here, the underlying conduct violated state law. U.S.S.G. § 2E1.3 cmt. n.1. In the present case, the underlying conduct was murder.

11

sentence, so long as the judge does not exceed the statutory maximum authorized by the jury's verdict. Booker held that judges may continue to make findings based on a preponderance of the evidence, provided they do not treat the guidelines as laws with binding effect. United States v. Hale, 448 F.3d 971, 988 (7th Cir. 2006), cert. denied, 2007 WL 37615 (U.S. Jan. 8, 2007) (citing United States v. Belk, 435 F.3d 817, 819 (7th Cir.), cert. denied, 127 S. Ct. 102 (2006)); see also United States v. Sliman, 449 F.3d 797, 801 (7th Cir. 2006) (stating that Booker "held that the Sentencing Guidelines are merely advisory and thus permits the district court to sentence a defendant on the basis of facts neither found by the jury nor stipulated to by the defendant"). Thus, there is no constitutional impediment to sentencing defendant under the first-degree murder guideline. United States v. Sherrod, 445 F.3d 980, 983 (7th Cir. 2006).[14] I concluded as a factual matter that U.S.S.G. § 2A1.1 was the appropriate guideline, a decision defendant did not challenge on appeal and which he does not seriously challenge now.[15]

---

[14] Sherrod provides a good example. In Sherrod, like the present case, the district court sentenced the defendant by cross-reference to the guideline for first degree murder, § 2A1.1. The defendant argued that this was error because the jury did not find him guilty of murder; rather, it found him guilty of carjacking with intent to cause death and serious bodily harm, which, if death results (as the jury found), carries a penalty of up to life in prison. The court of appeals held that the district court did not err in using the first degree murder guideline but rather "properly carried out its responsibility under United States v. Booker, 543 U.S. 220 (2005) to determine, based on a preponderance of the evidence, the facts relevant to an advisory guideline range, such as whether the killing . . . would have been murder under federal law. That's how it's supposed to be done – there was no error." Id. at 983.

[15] Defendant contends that the jury's findings support a sentence no greater than the guidelines applicable to second degree murder, voluntary manslaughter or involuntary manslaughter, which start at a base level of 12. (Def.'s Mem. at 5-6.) As stated above, I am not limited by the jury's findings in selecting the appropriate guideline. In any event, in criminal history category V, offense level 12 produces a sentence of 27-33 months. Such a sentence would, for the reasons set forth above, be totally insufficient to provide

12

Next, while continuing to "maintain[] his innocence," defendant posits several possible factual scenarios related to the murder "for the sake of argument." (Def.'s Mem. at 6.) He asks, what if he was merely present when Gonzalez was picked up and taken to the murder scene? What if he struck her in only a non-fatal manner? What if he intended only to participate in beating Gonzalez and tried to intervene when it became apparent she was being killed? The credible evidence does not support any of these scenarios. Defendant participated in an intentional murder, as I previously found. Defendant's apparent contention that I should now disregard that finding based on his musings about what might have happened is meritless, particularly given his assertion that he "stands by his trial testimony" (id.), which I found perjurious.[16] Equally meritless is his contention that I should impose sentence in this case under U.S.S.G. § 2E1.3(a)(1), which calls for an offense level of 12. (Id. at 7.) Such a sentence would shockingly depreciate the seriousness of the offense, for the reasons set forth herein.[17]

Defendant argues that unless I can unequivocally find that the first degree murder guideline applies, "a significant Sixth Amendment violation will have been acknowledged by the Court." (Def.'s Mem. at 6.) He again misunderstands Booker. I previously found that U.S.S.G. § 2A1.1 applied; the procedure for determining the applicable guideline

---

just punishment, protect the public and deter others.

[16]Defendant quotes my statement at sentencing that "there are certain unanswered questions about this whole matter." (Def.'s Mem. at 3.) However, I was paraphrasing a statement by the prosecutor. I nevertheless found that U.S.S.G. § 2A1.1 was the proper guideline based on the evidence presented.

[17]Defendant also ignores all of his other conduct, focusing only on the Gonzalez murder. While the murder was the most serious aspect of his offense, it is hardly the only thing he did.

13

range has not changed post-Booker. See United States v. Garcia, 439 F.3d 363, 369 (7th Cir. 2006) ("After Booker, courts must compute the guidelines sentence just as they would have done before, finding necessary facts under a preponderance standard, then decide whether the guidelines sentence is the correct sentence to give the particular defendant.") (internal quote marks omitted). The Sixth Amendment is violated in the present circumstances only if the court, knowing that the guidelines did not mandate a particular sentence, would instead have imposed a lesser sentence. See Paladino, 401 F.3d at 484. For the reasons stated in this memorandum, I would impose the same sentence on defendant even under the advisory regime.

Defendant next notes that the sentencing transcript reveals that I did not express "any particular joy in imposing the life sentence." (Def.'s Mem. at 8.) I doubt that any judge considering the facts of this case would be gleeful. As I noted in another Paladino decision in this case, "The discretionary imposition of a life sentence is a most serious matter. Only if the purposes of sentencing can be satisfied with nothing less should such a sentence be pronounced." (R. 2402 at 8.) Defendant correctly notes that my denial of a departure at the original sentencing does not necessarily mean that I would not impose a lesser sentence under an advisory regime. See United States v. Castro-Juarez, 425 F.3d 430, 436 (7th Cir. 2005) (noting that a non-guideline sentence need not be supported by unusual circumstances, as a pre-Booker departure would). However, having now given full consideration to the § 3553(a) factors, I conclude that a life sentence is necessary to satisfy the purposes of sentencing.[18]

---

[18] Defendant contends that the fact that I could not even consider a term of years "alone demonstrates the type of illegal sentence that increase[d] [Mendez's] punishment

14

Defendant also argues that individuals who committed worse murders than he did have received lesser sentences. (Def.'s Mem. at 9, citing United States v. Fountain, 642 F.2d 1083, 1096-98 (7th Cir. 1981); United States v. Black Elk, 579 F.2d 49, 50-51 (8th Cir. 1978).) Defendant concedes that these were not RICO cases involving extensive criminal enterprises, and that they involved different statutes and factual settings. (Def.'s Mem. at 10.) To those distinctions I would add that both cases were pre-Sentencing Reform Act. For these reasons, I find that such cases have little or no bearing on the matter before me.

Defendant contends that given what is at stake, his life, the fact that the court was forbidden to consider a sentence to a term of years is alone sufficient to demonstrate a miscarriage of justice. (Def.'s Mem. at 10.) However, as the case he cites holds, a miscarriage of justice in this context occurs only when the court, "having thought itself bound by the guidelines, imposes a longer sentence than it would have if it had been aware of its ability to exercise its discretion." United States v. Lafuente, 426 F.3d 894, 899 (7th Cir. 2005).

Defendant argues that because of the "ministerial and perfunctory nature" of the original sentencing procedure, his counsel "did not take the time to gather information relevant to a normal sentencing proceeding." (Def.'s Mem. at 11.) Defendant mis-characterizes the nature of pre-Booker sentencing. While the court in most cases had to follow the guidelines, it could depart when the case was outside the heartland. See 18

---

which gives rise to the appearance of a miscarriage of justice." (Def.'s Mem. at 9, internal quote marks and citation omitted.) Defendant is wrong. The Seventh Circuit has not held that every sentence imposed under mandatory guidelines is unconstitutional. Rather, it has adopted the Paladino procedure to determine whether the defendant was prejudiced by the court's use of mandatory guidelines. Further, at defendant's original sentencing, I acknowledged my authority to depart and impose a sentence of a number of years.

15

U.S.C. § 3553(b); U.S.S.G. § 5K2.0. In the present case, I considered defense counsel's arguments as a request for a departure, which I denied. Further, defendant has now been given the opportunity to present any arguments for a lower sentence under § 3553(a). He fails to present anything persuasive.

Finally, defendant argues that judicial economy favors a decision to re-sentence. He notes that his co-defendant, Andrew Acosta, had his case remanded for re-sentencing because his lawyer preserved an Apprendi-type claim at sentencing. See Olson, 450 F.3d at 683. Defendant contends that it was unreasonable for his lawyer not to also preserve such an argument. "Such failure to object was unreasonable especially in light of the evolving nature of the Apprendi decision, which decision formed the basis of the Booker decision, is still evolving and may quite possibly continue to evolve for years to come. The merit in an ineffective assistance of counsel claim in this regard is amply demonstrated by the outcome of co-defendant Acosta's appeal." (Def.'s Mem. at 12.) Defendant claims that the court should therefore elect to re-sentence him now "to conserve judicial resources associated with a later claim of ineffective assistance of counsel, which claim he believes to be meritorious." (Id.)

The argument is off base. First, I note that I re-imposed a life sentence on Acosta following the (full) remand of his sentence. (R. 2400, 2401.) I conclude that such a sentence is also necessary in defendant's case. Thus, defendant suffered no prejudice based on counsel's failure to raise an Apprendi objection, as Acosta's lawyer did. Second, although I pre-judge no motion defendant may later elect to file, I note that courts have rejected the notion that lawyers performed deficiently by failing to predict changes in the law such as those brought about by Apprendi, Blakely and Booker. See, e.g., Knox v.

16

United States, 400 F.3d 519, 522 (7th Cir. 2005); Fuller v. United States, 398 F.3d 644, 650 n.4 (7th Cir.), cert. denied, 126 S. Ct. 236 (2005). In sum, I see no reason why judicial resources are better preserved by requesting the Seventh Circuit order a full remand. Defendant has presented no argument under § 3553(a) which persuades me that a different sentence is appropriate, so the result would be the same.

### III. CONCLUSION

For the reasons stated, I determine that I would impose the same sentence knowing that the guidelines are advisory. The Clerk is directed to transmit this memorandum to the court of appeals.

**SO ORDERED**.

Dated at Milwaukee, Wisconsin this 11th day of January, 2007.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge